IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KADIN HAWKEYE LEWIS,<br><br>Defendant. | CR 23-143-BLG-SPW<br><br>ORDER ON MOTION FOR VIOLATIONS OF THE DUE PROCESS PROTECTIONS ACT |

Before the Court is Defendant Kadin Hawkeye Lewis's Motion for Violations of the Due Process Protections Act. (Doc. 81). Lewis seeks an order compelling the Government to disclose alleged *Brady* material from interviews conducted by Montana Division of Criminal Investigation (DCI) agents with his cellmate, Kamran Mallak, and Mallak's associate, Shawn Herman. (Doc. 82 at 8). He further requests production of text messages exchanged between DCI Agent Ryan Eamon and Herman, as well as *Henthorn* material from Agent Eamon's personnel file. (*Id.* at 10–11).

The Court held a hearing on this Motion, along with Lewis's other pending motions (Docs. 84, 86), on September 5, 2025. Testimony was provided by FBI Special Agent Matthew Deurmeier and Park County Sheriff's Office (PCSO)

1

Detectives Brian Green and Jason Hopkin. For the following reasons, the Court denies Lewis's Motion.

## I.   Background

### A.   *Procedural Background*

On October 7, 2022, Lewis was arrested and charged by the State of Montana with deliberate homicide, in violation of Montana Code Annotated § 45-5-102. (Doc. 93-1 at 2–3). On December 7, 2023, he was charged in the United States District Court for the District of Montana with Possession of Unregistered Destructive Devices, in violation of 26 U.S.C. § 5861(d). (Doc. 1).

The State dismissed Lewis's homicide charges on July 15, 2024. (Doc. 92-1 at 1–2). The following day, Lewis made his initial appearance before United States Magistrate Judge Timothy J. Cavan. (Doc. 82 at 2). On October 17, 2024, a Superseding Indictment added the charges of Attempted Malicious Use of Fire and Explosives, in violation of 18 U.S.C. § 844(i), and Carrying Explosives During the Commission of a Felony, in violation of 18 U.S.C. § 844(h)(2). (Doc. 20).

### B.   *Factual Background*

From July 16 to July 31, 2024, Lewis was incarcerated at the Yellowstone County Detention Center, where Kamran Mallak was assigned as his cellmate. (Doc. 82 at 3). During this time, Lewis allegedly confessed to Mallak the conduct underlying both his state and federal charges. (*Id.*; Doc. 93-10 at 1).

Mallak relayed this information to Shawn Herman, a prisoner-rights advocate. (Doc. 83-2 at 27). According to Herman, Mallak reported that Lewis boasted about killing his mother's boyfriend and stalking schools in preparation for a mass shooting. (*Id.* at 28). Herman further stated that she overheard Lewis confess to the homicide during a phone call with Mallak. (*Id.* at 75). Herman and Mallak formulated a plan to provide incriminating information to law enforcement in exchange for leniency on Mallak's charges. (*Id.* at 75–79).

Herman contacted the local police department responsible for handling Lewis's murder charges, which referred her to DCI Agent Ryan Eamon. (*Id.* at 32–33). Agent Eamon was involved in the Lewis investigation throughout his entire tenure at DCI. (*Id.* at 133).

In July 2024, Herman met with Agent Eamon for a recorded interview. (*Id.* at 34). The two spoke for about 30 minutes regarding Lewis's confession. (Doc. 82 at 5). During the meeting, Agent Eamon stated that he had informed state prosecutor John Ryan that Mallak was cooperating with law enforcement and assisting in reopening Lewis's state homicide case. (Doc. 83-2 at 34). Following the interview, Herman and Agent Eamon exchanged numerous text messages, with Herman acting as an intermediary between Eamon and Mallak. (*Id.* at 35–38). Herman retained approximately 200 of these messages, which were later subpoenaed by the Billings Police Department. (*Id.*).

3

On August 7, 2024, DCI Agents Eamon and James Ward interviewed Mallak. (Doc. 82 at 5–6). During the interview, Mallak provided a written document containing statements allegedly made by Lewis regarding the murder of John Doe and his plans to carry out a mass-casualty event. (Doc. 93-10 at 1).

DCI officers subsequently contacted FBI Special Agent Deurmeier and advised him that Mallak had provided information pertinent to the federal investigation into Lewis. (Doc. 93-11 at 1). The DCI agents provided the FBI with a copy of the written statement Mallak had given during his interview. (*Id.*). On August 9, 2024, Agent Deurmeier interviewed Mallak at the Yellowstone County Detention Center. (Doc. 93-10 at 1). Mallak recounted that Lewis described luring John Doe into his trailer and killing him, along with his plans to carry out a mass-casualty event at Chico Hot Springs. (*Id.* at 2–3).

In January 2025, Lewis's attorney, Steven Babcock, received a phone call from Rufus Peace, Mallak's attorney. (Doc. 82 at 4). Peace informed Babcock of an upcoming hearing on a motion to dismiss filed on Mallak's behalf, alleging outrageous government conduct. (*Id.*). In that motion, Peace asserted that Montana DCI agents made false promises to Mallak regarding the resolution of his own case in exchange for his cooperation against Lewis. (*Id.*). Peace further alleged that Agent Eamon disparaged the strength of Mallak's case and falsely represented that specific officials from both the County Attorney's Office and Attorney General's

4

Office had discussed the cases of Mallak and Lewis. (*Id.* at 4–5). In support of these allegations, Peace attached text messages between Herman and Agent Eamon. (*Id.*). The County Attorney's Office responded by asserting that Herman had doctored the text messages. (*Id.* at 5).

At the hearing on Mallak's motion to dismiss, the State conceded that the text messages were authentic. (Doc. 83-2 at 12). Further, Agent Eamon acknowledged that he had made false statements to Herman to maintain her and Mallak's cooperation in the Lewis investigation. (*Id.* at 142–43). For example, Agent Eamon told Herman that he was meeting with Yellowstone Deputy County Attorney Ed Zink to discuss Mallak's cooperation. (*Id.*). He later admitted, however, that he had neither met with Zink nor intended to do so. (*Id.*; Doc. 82-2 at 6–7).

On May 6, 2025, Assistant United States Attorney Jeffrey Starnes emailed Lewis's attorneys, Babcock and Gillian Gosch. (Doc. 82-6 at 5). The email included a copy of the transcript from Mallak's hearing. (*Id.*). Starnes advised that the Government did not plan to call Mallak or Herman as witnesses, elicit testimony regarding statements Lewis allegedly made to either individual, or introduce any written materials they had obtained from Lewis. (*Id.*). Starnes further noted, however, that if the defense elected to call Mallak or Herman as witnesses, the Government might seek to cross-examine them concerning information Lewis allegedly conveyed while incarcerated with Mallak. (*Id.*).

5

Gosch responded by email requesting the following discovery: (1) Herman's July 2024 interview conducted by DCI; (2) Mallak's August 2024 interview conducted by DCI; (3) all text messages between Agent Eamon and Herman; and (4) an FBI Form 302[1] documenting Agent Deurmeier's jail interview with Mallak. (*Id.* at 3–4). In reply, Starnes asserted that his office had undertaken no substantive work with DCI in connection with Lewis's federal case. (*Id.* at 2). He further reiterated that the Government would not call Mallak or Herman as witnesses, nor would it introduce or reference any statements or materials arising from their interactions with Lewis. (*Id.*). The Government also represented in its response brief that it does not intend to call Agent Eamon as a witness at trial. (Doc. 92 at 19). Although the Government produced the FBI Form 302 from Agent Deurmeier's interview, it has not provided any of the other materials requested by defense counsel. (Doc. 82 at 9). Lewis now moves the Court to order the Government to tender the remaining requested discovery. (*Id.* at 11).

## II.  Legal Standard

Rule 12(b)(1) of the Federal Rules of Criminal Procedure provides that a party may raise by pretrial motion any defense, objection, or request that the Court can

---

[1] An FBI Form 302 is used by the government to document the substance of an interview. The FBI characterizes it as a report intended to capture information that may later be presented as testimony. Typically, an agent takes handwritten notes during a witness interview and subsequently compiles those notes in a Form 302.

6

determine without a trial on the merits. A pretrial motion is proper when it involves questions of law rather than fact. *United States v. Shortt Acct. Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986). "[I]f the pretrial motion raises factual questions associated with the validity of the defense, the district court cannot make those determinations." *United States v. Schafer*, 625 F.3d 629, 635 (9th Cir. 2010) (quoting *Shortt Acct. Corp.*, 785 F.2d at 1452).

The Court has determined Lewis's Motion is appropriate for pretrial resolution because it solely involves a question of law.

## III. Discussion

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court delineated the government's disclosure obligations under the Due Process Clause. The Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*

The *Brady* rule extends to evidence known to the prosecution as well as any material evidence "known only to police investigators." *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995). Prosecutors therefore have "a duty to learn of any favorable evidence known to the others acting on the government's behalf . . . including the

police." *Id.* at 437. This duty applies even absent a request from the defendant. *United States v. Agurs*, 427 U.S. 97, 107 (1976).

Although *Brady* imposes disclosure obligations, it does not create a general constitutional right to discovery in criminal cases. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). As the Supreme Court has observed, "the Due Process clause has little to say regarding the amount of discovery which the parties must be afforded." *Id.* (internal quotation marks omitted) (quoting *Wardius v. Oregon*, 412 U.S. 470, 474 (1973)).

Under *Brady*, the prosecution is only required to disclose information that is favorable to the defendant, "either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 263 (1999). Inculpatory evidence does not fall within *Brady*'s scope. *United States v. Munoz*, 409 F. App'x 117, 120 (9th Cir. 2010).

Further, evidence is "material" under *Brady* only if its disclosure creates a reasonable probability of a different result at trial. *United States v. Bagley*, 473 U.S. 667, 682 (1985). Impeachment evidence is particularly likely to be material when it undermines the testimony of a witness critical to the prosecution's case. *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005). However, no authority requires the Government to disclose potential impeachment evidence for non-testifying

8

witnesses. *United States v. Mayers*, No. CR16-0258, 2017 WL 823292, at *2 (W.D. Wash. Mar. 2, 2017).

Here, the Government's nondisclosure of Mallak and Herman's DCI interviews, the text messages between Agent Eamon and Herman, and Agent Eamon's personnel file does not constitute a *Brady* violation.

### A. Mallak and Herman's DCI Interviews

The Court first finds that *Brady* does not compel the Government's disclosure of Mallak and Herman's interviews with DCI. Lewis asserts that disclosure is necessary under *Brady* to allow his counsel to evaluate whether either individual could serve as a favorable witness at trial. (Doc. 82 at 10). The Government, however, maintains that the interviews contain solely inculpatory statements—specifically, allegations that Lewis confessed to committing murder and to planning a mass-casualty attack—and therefore do not constitute *Brady* material. (Doc. 92 at 13).

The record supports the Government's position. In his interview with DCI agents, Mallak provided a written statement recounting Lewis's alleged admissions regarding the killing of John Doe and his plans to carry out an attack involving Molotov cocktails and firearms. (Doc. 93-10 at 1). During Mallak's subsequent FBI interview, Mallak told Agent Deurmeier that Lewis described luring John Doe into his trailer and killing him. (*Id.* at 2). Mallak also reported that Lewis discussed

9

plans for a mass-casualty attack at Chico Hot Springs using Molotov cocktails and firearms. (*Id.* at 2–3).

Although the Government has not produced the recording of the DCI interview, it is reasonable to infer that Mallak relayed substantially the same information to DCI agents as he did to Agent Deurmeier two days later. Both interviews focused on statements Lewis purportedly made to Mallak while they were cellmates, and both occurred in the context of Mallak's effort to obtain leniency in connection with his own pending criminal charges.

Likewise, the record contains no indication that Herman's interview with DCI included exculpatory evidence. At Mallak's state court hearing on the motion to dismiss, Herman testified that she became concerned about Lewis because "he was always talking about . . . this person that he murdered, and wanting to kill kids." (Doc. 83-2 at 32). She further explained that she and Mallak jointly decided to report this information to law enforcement. (*Id.*). According to defense counsel, during Herman's interview with DCI, she discussed a confession by Lewis that she overheard while speaking with Mallak on the phone. (Doc. 82 at 5).

While neither interview has been provided to the Court, there is no basis to conclude that they contain information favorable to Lewis with respect to his federal charges. The stated purpose of the interviews was to provide incriminating information about Lewis in exchange for leniency on Mallak's pending criminal

10

charges. Offering exculpatory information would have undermined that objective. Moreover, Lewis has not identified any specific facts or legal theory demonstrating how the interviews would be favorable to his defense.

Additionally, because Mallak and Herman did not encounter Lewis until 2024, it is highly unlikely that either could possess exculpatory information relevant to the conduct underlying his federal charges, which allegedly occurred in 2022.

Accordingly, because Lewis has failed to show that the DCI interviews of Mallak and Herman contain exculpatory material, and because the record reflects that the statements were inculpatory in nature, the Government is not required to disclose the interviews under *Brady*.

B.   *Text Messages Between DCI Agent Eamon and Herman*

Next, the Court concludes that the Government is not required to disclose the text messages exchanged between Agent Eamon and Herman. Under Federal Rule of Criminal Procedure 16(a)(2), courts are prohibited "from ordering the government to produce statements of prospective witnesses whom the government subsequently decides not to call at trial." *United States v. Cadet*, 727 F.2d 1453, 1469 (9th Cir. 1984).

Lewis argues that the text messages are both relevant and material because they reflect Agent Eamon's alleged deceitful behavior in communicating with Herman and "bare[] on every step he took during the Lewis investigation." (Doc.

11

82 at 11). The Government acknowledges that the messages could potentially be used to challenge Agent Eamon's investigative methods. (Doc. 92 at 19). However, because it does not intend to call Agent Eamon as a witness, it maintains that any evidence concerning his bias or motive is neither relevant nor subject to disclosure. (*Id.*).

In light of the Government's representation that it will not call Agent Eamon as a witness, the Court finds no basis to compel production of the text messages.

### C.   *Agent Eamon's Personnel File*

Finally, the Court finds that the Government is not obligated to produce Agent Eamon's personnel file. Under *Brady*, a defendant is entitled to exculpatory evidence in the Government's possession, including information that may cast doubt upon the credibility of its witnesses. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *Bagley*, 473 U.S. at 676–77. With respect to the personnel files of law enforcement witnesses, the Ninth Circuit held in *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991), that upon a defendant's request, the Government has a duty to review the personnel files of its testifying agents for material that could impeach their credibility. *See also Cadet*, 727 F.2d at 1467. This obligation arises because, without conducting such a review, the Government cannot reliably determine whether disclosure is required under *Brady*. *Henthorn*, 931 F.2d at 31.

Following its examination of the requested personnel files, the Government is obligated to produce only that information which is, or may be, material to the defendant's case. *Id.* However, nothing in the relevant case law "suggests that *Henthorn* extends to non-testifying witnesses—federal, state or local." *United States v. Talao*, No. CR-97-0217, 1998 WL 1114043, at *10 (N.D. Cal. Aug. 14, 1998), *vacated in part on other grounds*, No. CR-97-0217, 1998 WL 1114044 (N.D. Cal. Oct. 1, 1998).

Here, the Government is not obligated to disclose the contents of Agent Eamon's personnel file. As discussed above, the Government does not intend to call Agent Eamon as a witness at trial. Accordingly, under *Henthorn*, there is no duty to review or disclose his personnel file for potentially exculpatory impeachment material.

Although Agent Eamon had some collaboration with federal investigators, his primary role was confined to the homicide investigation. He played a minimal part in the present federal case against Lewis and will not be testifying. As such, his personnel records are not relevant and fall outside the scope of the Government's disclosure obligations.

Therefore, the Government is not required to review or examine Agent Eamon's personnel files.

## IV. Conclusion

IT IS HEREBY ORDERED that Defendant Kadin Hawkeye Lewis's Motion for Violations of the Due Process Protections Act (Doc. 81) is DENIED.

DATED this 29th day of September, 2025.

SUSAN P. WATTERS
United States District Judge